UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

T.D.H.,

      Plaintiff,

      v.

MIDDLETOWN BOROUGH
POLICE DEPARTMENT, et al.,

      Defendants.

CIVIL ACTION NO. 1:22-cv-01459

(SAPORITO, J.)

## MEMORANDUM

In this federal civil rights action, the plaintiff, Tyler Henderson, claims that a police officer, defendant Juan J. Castro, used excessive force in effecting an arrest of the plaintiff, and that other police officers present, defendants Scott Tantlinger and Derek Weinoldt, failed to intervene to protect Henderson from that use of excessive force, all in violation of Henderson's Fourth Amendment rights. Henderson further claims that this use of excessive force violated his Fourteenth Amendment equal protection rights, and he also asserts state-law claims for intentional infliction of emotional distress and battery against all defendants. In addition to these individual police officers, Henderson seeks to hold the Middletown Borough Police Department liable as the

employer of two of these three police officers.[1]

The defendants have filed two separate but substantially similar motions for summary judgment. Officer Weinoldt has filed a motion for summary judgment, Doc. 66, together with a brief in support of his motion, Doc. 67, and a statement of undisputed material facts, Doc. 68. The Middletown Defendants—Officers Castro, Tantlinger, and their municipal employer—have filed a motion for summary judgment, Doc. 69, together with a brief in support of their motion, Doc. 70, and a statement of undisputed material facts, Doc. 69-1. The plaintiff has failed to file any substantive response whatsoever to either motion.[2]

---

[1] Officers Castro and Tantlinger are police officers employed with the Middletown Borough Police Department. Officer Weinoldt is a police officer employed with the Lower Swatara Township Police Department, and he had responded to assist the Middletown officers with the arrest. The complaint named two additional Middletown police officers as defendants, both of whom were voluntarily dismissed in December 2023. *See* Doc. 30.

[2] We note that, although he was represented by counsel at the time when he filed his complaint, Henderson's attorney was permitted to withdraw from representing him in October 2024. *See* Doc. 48. Henderson was unable to secure substitute counsel, and he has been appearing pro se in this matter since then. His only response to the summary judgment motions is a handwritten pro se submission which states: "Tyler D[.] Henderson ask that the courts move into judgement *[sic]* the pleadings on defendants Juan J[.] Castro, Derek Wein[]oldt, Scott Tantlinger and Middletown Borough Police Department[.] Today's Date is 11-4-25[.] Thank you[.]" Doc. 79.

## I.    LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient

disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that *prima facie* showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a *form* which is inadmissible at trial, the *content* of the evidence must be capable of

admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

Here, the defendants have moved for summary judgment, but the plaintiff has failed to submit a brief in opposition or any other papers contesting the defendants' motions. The plaintiff's failure to actively oppose the defendants' motions for summary judgment implicates two local rules, which provide that a party who fails to file a brief in opposition to a motion "shall be deemed not to oppose such motion," M.D. Pa. LR 7.6, and that all material facts set forth in the movant's statement of material facts "will be deemed to be admitted unless controverted" by a counter-statement of material facts by the non-movant, M.D. Pa. LR 56.1.

However, the plaintiff's failure to respond to the motion does not mean that the defendants are automatically entitled to summary judgment. *See Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990). These local rules must be construed and applied in a manner consistent with Rule 56 of the Federal Rules of Civil

Procedure. *See id.* at 174. Thus, in the context of a motion for summary judgment, a non-movant's failure to file an opposition brief and counter-statement of material facts is "construed as effecting a waiver of [the non-movant's] right to controvert the facts asserted by the moving party in the motion for summary judgment or the supporting material accompanying it." *Id.* at 175–76. The moving party must nevertheless establish that, based on the facts set forth in support of its motion, it is entitled to judgment as a matter of law. *See id.*; *see also Lorenzo v. Griffith*, 12 F.3d 23, 28 (3d Cir. 1993); *Miller v. Ashcroft*, 76 Fed. App'x 457, 462 (3d Cir. 2003) ("Even though the applicable [Middle District of Pennsylvania] local rules provide that a summary judgment motion is to be considered unopposed and its statement of material facts admitted where a responsive brief is not timely filed, the Magistrate Judge was still required to find that the undisputed facts warranted judgment as a matter of law." (citations omitted)).

In other words, in the absence of active opposition by the non-movant, the two-step, burden-shifting analysis that normally applies on summary judgment is abbreviated to just the first step, requiring the moving party to make a *prima facie* showing that it is entitled to

summary judgment, based on the undisputed facts of record. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

## II.    UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, the following facts are undisputed:[3]

This lawsuit arises from an encounter between Henderson and the defendants that occurred on October 11, 2020. At the time of this encounter, the plaintiff identified as a transgender female and went by the name of Tiffany Henderson.[4] His legal name, however, is Tyler Deonte Henderson.

On October 11, 2020, at approximately 7:30 p.m., the Middletown Police Department received an anonymous 9-1-1 call reporting screaming and yelling and objects being smashed at 110 Woodland Avenue, Apartment 203, Middletown, Pennsylvania (the "Premises"). Officers Castro and Tantlinger were dispatched to the Premises in response to the active disturbance report by 7:31 p.m.

After Castro and Tantlinger were dispatched, the complainant

---

[3] This recitation of undisputed material facts is derived from the defendants' statements of material facts, the substance of which is deemed admitted because Henderson has failed to respond to them.

[4] We note that, during the course of this litigation, Henderson has advised the court that he now prefers to be addressed by male pronouns.

called back and informed the dispatcher that she had observed an individual, later determined to be Henderson, leaving Apartment 203 on foot, making threats. The caller described the subject of this person as a "black female adult, wearing hot pink and leopard print." Dispatch informed Castro and Tantlinger of this updated information.

While en route to the Premises, Castro instructed Tantlinger, who was in a separate car, to conduct a traffic stop on a vehicle which was observed speeding in the area of the Premises on the suspicion that the driver might have been involved in the disturbance to which they were responding. Officer Weinoldt arrived and assisted in the traffic stop. Ultimately, it was determined that the vehicle was not involved in the disturbance.

Meanwhile, Castro continued on to the apartment complex, parked his vehicle, and attempted to locate the female described by the dispatcher. Castro did not observe the female outside, so he proceeded inside the building and up the stairs to Apartment 203. He knocked on the door several times and announced his presence as "Middletown Police." No one answered the door.

Castro contacted dispatch and prepared to contact witnesses. He

then heard the front door of the apartment complex open and observed a woman wearing a pink shirt and leopard print pants coming up the stairs. The woman was later identified as the plaintiff, Henderson. The plaintiff was alone, on the phone, and yelling at someone. Officer Castro heard Henderson yell "I'm not fucking around, get the fuck out of here." He then observed that Henderson matched the description provided by dispatch, and that Henderson appeared to Castro to be agitated. Castro attempted to make contact with Henderson, asking if he was okay and advising that he needed to talk to him, but Henderson brushed past Castro, proceeded to Apartment 203, and entered the Premises.

Officer Castro knocked on the door to the Premises and Henderson opened the door. Henderson immediately started screaming at Castro, accusing the police officer of harassing him. Castro advised Henderson that he was called to the Premises for a report of a fight and asked Henderson to calm down and tell him what was happening. Castro spoke to Henderson in a calm tone of voice and attempted to deescalate the situation. But Henderson continued to yell, scream, and curse at Officer Castro.

After completing their traffic stop, Officers Tantlinger and Weinoldt

arrived on scene at the Premises at approximately 7:44 p.m. In his incident report, Weinoldt reported that, upon arriving, he could hear Henderson yelling at Castro, and Castro responding calmly. Tantlinger and Weinoldt initially stood near the stairs while Castro continued to speak with Henderson.

Officer Castro attempted to explain the nature of their presence, but Henderson repeatedly cut him off. At his deposition, Tantlinger characterized Henderson's tone as combative and aggressive. Castro repeatedly advised Henderson to calm down.

Officer Castro asked for the plaintiff's name and advised that the officers needed to check the apartment. Henderson flung his ID card at Castro's chest. Castro caught it and observed that it bore the name "Tyler Deonte Henderson." Castro repeated the name off the ID card and asked if that was what the plaintiff wanted to be called. Henderson said "get the fuck out of my face."

Castro asked Henderson who he was fighting with inside the apartment, and Henderson immediately began to scream: "no fucking body . . . none of your fucking business . . . this is my fucking house you pussy . . . I pay for this shit so what the fuck do you need now pussy?"

Castro warned Henderson to lower his voice and control his cursing, as they were in an apartment building with other residents nearby. Henderson replied by continuing to scream: "Fuck that I pay for this shit . . . . this is my fucking home . . . do what you have to do then . . . fucking harassing me in my fucking home." Castro again warned Henderson to calm down or the officer would be compelled to charge him for his behavior.

Castro then asked who Henderson was fighting with and Henderson again screamed: "no fucking body is in my fucking home . . . fucking check and then get the fuck out of my face with this harassment!" Castro again warned Henderson to calm down, and he asked if the officers could check the apartment. Henderson stepped aside and screamed: "Go the fuck ahead . . . I'm tired of fucking repeating myself with you fucking assholes . . . go check damn it."

Officers Tantlinger and Weinoldt entered the apartment and performed a safety sweep of the interior. While they did that, Officer Castro continued to try to talk to Henderson, explaining that there was a call for an active disturbance that could be a fight or domestic disturbance in progress, and he asked what had gotten Henderson so

upset. In response, Henderson screamed and cursed at Castro, who warned Henderson that he would be charged with disorderly conduct if he continued to scream and curse. Henderson continued to scream, yelling: "I pay $1,500 a month for this shit I can yell in my house fuck you!" While screaming, Henderson would clap his hands and loudly stomp his feet. Castro again warned Henderson to stop screaming and cursing.

At that point, Henderson's phone rang and he answered it and immediately began screaming at the caller. Henderson then threw his phone down and stomped his feet while continuing to scream. Officer Castro then advised Henderson that he would be receiving a citation for disorderly conduct. Henderson responded by continuing to curse and scream at Castro, yelling "fuck you boo boo . . . you fucking pussies," while clapping his hands within a foot of Castro's face.

Based on Henderson's ongoing behavior, despite multiple warnings to stop, Officer Castro advised Henderson that he was now being charged with misdemeanor disorderly conduct. Henderson continued to scream at Castro and clap his hands in Castro's face. At that point, Castro determined that an in-custody arrest was necessary because the incident

was escalating. Officer Castro advised Henderson that he was under arrest and motioned for Officers Tantlinger and Weinoldt to take Henderson into custody.

Officer Tantlinger instructed Henderson to put his hands behind his back, and he attempted to place Henderson in handcuffs, placing his hand on Henderson's arm. Henderson pulled away from Tantlinger and Weinoldt and moved toward Castro in the hallway, hitting Castro in the neck or collarbone area. Henderson attempted to tackle Castro, who stiff-armed Henderson so he could not knock Castro down. Tantlinger took ahold of Henderson's arms and ordered Henderson to stop resisting. Henderson ripped away from Tantlinger's grasp again and spun around, flailing his arms and striking Weinoldt in the face.

Officers Tantlinger and Weinoldt continued to attempt to gain control of Henderson, and Henderson continued to struggle, flail, and resist arrest. Henderson was kicking, driving his body into Weinoldt and the wall, and thrashing around, contorting his body in an effort to escape Tantlinger's grasp and refusing to put his hands behind his back.

Officers Tantlinger and Castro were concerned that Henderson would get out of their control and someone would get hurt. Tantlinger

attempted to reach for his Taser, but was unable to do so. Tantlinger continued to issue verbal commands for Henderson to calm down and place his hands behind his back, but Henderson continued to resist, struggle, and kick. Tantlinger began to lose his grip on Henderson. Officer Castro had independently concluded that it was necessary to deploy his Taser to halt Henderson's resistance, but Tantlinger also yelled for Castro to tase Henderson to stop his resistance.

Officer Castro deployed his Taser in "dart" mode, striking Henderson's right flank, and Henderson went to the ground. Officers Tantlinger and Weinoldt attempted to place Henderson in handcuffs, but Henderson continued to resist. Castro pulled the Taser trigger again to obtain neuromuscular incapacitation, but it failed, and Henderson continued to resist. Castro then used the Taser to deliver a "drive stun" to Henderson's lower extremity, allowing Tantlinger and Weinoldt to secure Henderson in handcuffs.

Henderson claims to have sustained an injury as a result of his being handcuffed, but he did not recall making any complaints of pain or otherwise communicating to the officers that the handcuffs were too tight. In fact, the first time Henderson recalled being aware of any injury

was after he had been placed in jail, and he did not recall making any complaint to jail staff regarding such an injury. Henderson has failed to produce any medical evidence of any assessment of the nature or cause of any injury. Indeed, the only documented medical complaint by Henderson upon his arrival at the jail was a complaint of *neck* pain. Henderson also presented to the Lancaster General Hospital Emergency Department approximately one week after his arrest, and following his discharge from jail, at which time his only complaint was of an assault by *prison guards*. In 697 pages of relevant medical records produced by the hospital in this case, there is no reference to any injury sustained by Henderson as a result of his October 11, 2020, arrest. At his deposition, Henderson testified that he filed suit to recover damages for the prison assault, and that case ended in a settlement.

After his October 11, 2020, arrest, Henderson was charged with multiple crimes, including felony aggravated assault, misdemeanor resisting arrest, and misdemeanor disorderly conduct. Ultimately, Henderson pleaded guilty to misdemeanor disorderly conduct pursuant to a plea agreement, and he was sentenced to serve a 12-month term of probation. He does not contest the lawfulness of his arrest.

At his deposition, Henderson admitted that he had been "very agitated and moving around." He did not recall voluntarily putting his hands behind his back or otherwise willingly facilitating his arrest, as opposed to resisting it. Henderson was also unable to identify any individuals who were treated differently than him based on their race or gender identification.

## III.  DISCUSSION

Henderson's complaint is comprised of five counts. In Count I, Henderson asserts a § 1983 federal civil rights claim against Officer Castro for the excessive use of force in effecting his arrest, in violation of his Fourth Amendment right to be free from unreasonable seizure. In Count II, Henderson asserts a § 1983 federal civil rights claim against Officers Weinoldt and Tantlinger for their failure to intervene to protect Henderson from Castro's allegedly excessive use of force, in violation of Henderson's Fourth Amendment right to be free from unreasonable seizure. In Count III, Henderson asserts a § 1983 federal civil rights claim against all defendants for treating Henderson, an African-American transgender female at the time of this incident, differently than similarly situated Caucasian transgender women, in violation of his

- 16 -

Fourteenth Amendment right to equal protection of the law. In Counts IV and V, Henderson asserts state-law claims of intentional infliction of emotional distress and battery against all defendants. Although named as a defendant to the action, none of these claims is expressly brought against Middletown Borough Police Department. The defendants have moved for summary judgment on all claims.

## A. Excessive Force Claim

Henderson claims that Officer Castro's use of a Taser against him— once in "dart" mode and once in "drive stun" mode—constituted the excessive use of force.[5]

"The use of excessive force during an arrest is a cognizable violation under the Fourth Amendment." *Geist v. Ammary*, 40 F. Supp. 3d 467, 475 (E.D. Pa. 2014) (citing *Bell v. Wolfish*, 441 U.S. 520, 534 n.16 (1979)). "[A] plaintiff may prevail on an excessive force claim if he can show that a seizure occurred and that the seizure 'was unreasonable under the circumstances.'" *Brown v. Cwynar*, 484 Fed. App'x 676, 679 (3d Cir. 2012)

---

[5] The complaint also appears to attempt to attribute force used by the other officers in the course of subduing Henderson—handcuffing him, kneeling on his back, pulling his hair, and beating him—to Officer Castro, but there is no evidence in the record that Castro used any force against Henderson other than deployment of the officer's Taser.

(quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)).

"A seizure occurs when a suspect 'submits to the police's show of authority or the police subject him to some degree of physical force.'" *Id.* at 680 (quoting *Abraham v. Raso*, 183 F.3d 279, 291 (3d Cir. 1999)). Thus, it is undisputed that Henderson was "seized" by Officer Castro.

As for whether that seizure was reasonable, "we examine the objective reasonableness of the officer['s] conduct." *Santil v. Borough of Carteret*, No. 22-2898, 2024 WL 3565308, at *8 (3d Cir. July 29, 2024) (citing *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015)). "This requires that we consider whether under the totality of the circumstances, the officer['s] actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." *Id.* (internal quotation marks omitted) (quoting *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004)).

> The following factors guide our analysis: (1) the severity of the crime at issue, (2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, (3) whether the suspect attempts to resist arrest or flee the scene, (4) the possibility that the persons subject to the police action are themselves violent or dangerous, (5) the duration of the action, (6) whether the action takes place in the context of effecting an arrest, (7) the possibility that the suspect may be armed, and (8) the number of persons with

- 18 -

whom the police officers must contend at one time.

*Id.* at *8 n.16 (citation modified) (first quoting *Santini*, 795 F.3d at 417

(citing *Graham v. Connor*, 490 U.S. 386, 396 (1989) (identifying the first

three factors)); and then quoting *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d

Cir. 1997) (identifying the last five factors), *abrogated on other grounds

by Curley v. Klem*, 499 F.3d 199, 209–11 (3d Cir. 2007)); *see also Geist*, 40

F. Supp. 3d at 476. Moreover,

> [t]he 'reasonableness' of a particular use of force must
> be judged from the perspective of a reasonable officer
> on the scene, rather than with the 20/20 vision of
> hindsight. . . . The calculus of reasonableness must
> embody allowance for the fact that police officers are
> often forced to make split-second judgments—in
> circumstances that are tense, uncertain, and rapidly
> evolving—about the amount of force that is necessary
> in a particular situation.

*Graham*, 490 U.S. at 396–97.

Although the gratuitous use of a Taser on an individual who is

"nonviolent, compliant, and poses no threat of danger" is objectively

unreasonable and thus unconstitutional, courts have "held that the use

of a taser on an individual who disobeys an officer or actively resists an

officer's commands is constitutionally reasonable." *See Randolph-Ali v.

Minium*, 793 Fed. App'x 146, 150 (3d Cir. 2019) (collecting cases); *see also*

- 19 -

*Geist*, 40 F. Supp. 3d at 476 & n.27 (collecting cases).

Applying the relevant factors, and viewing the undisputed material facts in the light most favorable to the nonmoving plaintiff, we conclude that no reasonable jury could conclude that Officer Castro's use of a Taser to subdue Henderson during his arrest was objectively unreasonable. Although there was nothing to suggest to the officers that Henderson might be armed, and the officers were contending with only a single arrestee at the time, the other factors identified above weigh overwhelmingly in favor of an objectively reasonable use of force. The crime at issue at the time when Castro deployed his Taser—aggravated assault involving bodily injury to an officer in the performance of his duty—is serious. Until he was finally subdued, Henderson was actively and violently resisting arrest, and in doing so, he clearly posed an imminent threat to the safety of the arresting officers, struggling with the officers, striking Weinoldt in the face, and attempting to tackle Castro. The use of force—one successful deployment of the Taser in dart mode and a second in drive stun mode—was brief in duration and clearly took place in the context of an arrest.

The moving defendants have made a *prima facie* showing that,

based on the undisputed facts of record, viewed in the light most favorable to the nonmoving party, they are entitled to summary judgment on the plaintiff's excessive force claim. The nonmoving plaintiff has failed to respond to the defendants' motions or statements of material facts. Accordingly, summary judgment will be granted in favor of the defendants with respect to the plaintiff's excessive force claim.[6]

## B. Failure to Intervene/Protect Claim

Henderson claims that Officers Weinoldt's and Tantlinger's failure to intervene to protect him from Officer Castro's use of a Taser against him constituted a violation of his Fourth Amendment rights as well.

To establish liability under a failure to intervene theory, a plaintiff must demonstrate that his underlying constitutional rights were violated, that the officer had a duty to intervene, and that the officer had a realistic and reasonable opportunity to intervene. *See Smith v. Mensinger*, 293 F.3d 641, 650–51 (3d Cir. 2002). Generally, an officer who

---

[6] We note that the defendants have also raised a qualified immunity defense with respect to this claim. But the matter of qualified immunity need not be addressed if the court determines that no underlying constitutional violation occurred. *See Schieber v. City of Phila.*, 320 F.3d 409, 423 (3d Cir. 2003); *Torres v. McLaughlin*, 163 F.3d 169, 174–75 (3d Cir. 1998).

is in the vicinity when a constitutional violation occurs has the opportunity to intervene, at least for summary judgment purposes. *See id.* at 650 ("[A]ll of the named officers were in the vicinity at some point when [the plaintiff] alleges he was beaten.").

Because, as addressed in the preceding section of this opinion, Henderson has failed to demonstrate that his underlying constitutional rights were violated, he cannot maintain his claim for failure to intervene. *See Chapolini v. Capodanno*, No. 21-2954, 2023 WL 179843, at *2 (3d Cir. Jan. 13, 2023) (per curiam) ("A failure-to-intervene claim requires showing an underlying constitutional violation occurred, and [the plaintiff has made no such showing." (citation omitted)); *Adams v. Selhorst*, 449 Fed. App'x 198, 204 (3d Cir. 2011) (per curiam) ("[Plaintiff] failed to demonstrate that her underlying constitutional rights were violated. Therefore, she cannot maintain a claim for failure to intervene.").

The moving defendants have made a *prima facie* showing that, based on the undisputed facts of record, viewed in the light most favorable to the nonmoving party, they are entitled to summary judgment on the plaintiff's failure-to-intervene/protect claim. The nonmoving

plaintiff has failed to respond to the defendants' motions or statements of material facts. Accordingly, summary judgment will be granted in favor of the defendants with respect to the plaintiff's failure-to-intervene/protect claim.[7]

### C. Equal Protection Claim

Henderson claims that the defendants treated him, an African-American transgender female at the time of this incident, differently than similarly situated Caucasian transgender women, in violation of his Fourteenth Amendment equal protection rights.

To establish an equal protection claim, a plaintiff "must point to an existing and relevant comparator." *Smith v. City of Atl. City*, 138 F.4th 759, 778 (3d Cir. 2025). This is because "the Fourteenth Amendment proscribes unequal treatment only among persons similarly situated according to a relevant standard of comparison." *Stradford v. Sec'y Pa. Dep't of Corr.*, 53 F.4th 67, 74 (3d Cir. 2022). "Other factors explaining disparate treatment will usually preclude persons from being similarly situated." *Id.*

Henderson has failed to produce any evidence whatsoever of

---

[7] *See supra* note 6.

similarly situated Caucasian transgender women—or any other combination of race and gender identity—who were treated differently from him when they violently resisted a lawful arrest. Absent such comparator evidence, Henderson's equal protection claim fails as a matter of law. *See Hargrave v. Ramsey*, 688 Fed. App'x 124, 127 (3d Cir. 2017); *see also Heath v. City of Phila.*, No. 16-5302, 2021 WL 2661520, at *5 (E.D. Pa. June 29, 2021) ("Plaintiff has not identified any similarly-situated comparators, crippling her Equal Protection claim.").

The moving defendants have made a *prima facie* showing that, based on the undisputed facts of record, viewed in the light most favorable to the nonmoving party, they are entitled to summary judgment on the plaintiff's equal protection claim. The nonmoving plaintiff has failed to respond to the defendants' motions or statements of material facts. Accordingly, summary judgment will be granted in favor of the defendants with respect to the plaintiff's equal protection claim.[8]

### D. Municipal Liability Claims

The complaint does not articulate any specific claims against Middletown Borough Police Department, but it has included it as a party,

---

[8] *See supra* note 6.

presumably as the employer of Officers Castro and Tantlinger.

"On its face, § 1983 makes liable 'every person' who deprives another of civil rights under color of state law." *Burns v. Reid*, 500 U.S. 478, 497 (1991) (Scalia, J., concurring in part and dissenting in part). In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court of the United States established that municipalities and other local governmental units are included among those "persons" subject to liability under § 1983. *Id.* at 690. A borough is such a municipality subject to liability as a "person" under § 1983. *Chizmar v. Borough of Trafford*, 454 Fed. App'x 100, 106 (3d Cir. 2011); *Cannarozzo v. Borough of W. Hazleton*, 575 F. Supp. 3d 510, 528 (M.D. Pa. 2021).

But "[u]nder *Monell*, a municipality cannot be subjected to liability solely because injuries were inflicted by its agents or employees." *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 249 (3d Cir. 2007). Rather, a municipality can be liable under § 1983 only if the conduct alleged to be unconstitutional either "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or is "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the

body's official decision-making channels." *Monell*, 436 U.S. at 690–91. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Jiminez*, 503 F.3d at 249. "A plaintiff must identify the challenged policy, attribute it to the [municipality or corporation] itself, and show a causal link between execution of the policy and the injury suffered." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984).

Here, the plaintiff has failed to adduce any evidence whatsoever regarding any policies, practices, or customs of the municipal defendant, apparently relying solely on a *respondeat superior* theory of liability with respect to the Middletown Borough Police Department, and thus his claims against the municipality—such as they are—fail as a matter of law. *See Jimenez*, 503 F.3d at 249. Moreover, in the absence of any underlying constitutional violations, Middletown Borough Police Department is entitled to judgment as a matter of law on any § 1983 *Monell* derivative liability claims against it. *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Mulholland v. Gov't Cnty. of Berks*, 706 F.3d

- 26 -

227, 238 n.15 (3d Cir. 2013).

The moving defendants have made a *prima facie* showing that, based on the undisputed facts of record, viewed in the light most favorable to the nonmoving party, they are entitled to summary judgment on the plaintiff's *Monell* municipal liability claims. The nonmoving plaintiff has failed to respond to the defendants' motions or statements of material facts. Accordingly, summary judgment will be granted in favor of the defendants with respect to the plaintiff's *Monell* municipal liability claims.

### E. State-Law Claims

Where a district court has dismissed all claims over which it had original jurisdiction, the court may decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3). Whether the court will exercise supplemental jurisdiction is within its discretion. *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009). That decision should be based on "the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995). "[I]n the usual case in which all federal-law claims are eliminated before trial,

the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n.7. Upon consideration of these factors and the record before us, we find nothing to distinguish this from the usual case. Therefore, the remaining state-law claims will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## IV.    CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment will be granted. The clerk will be directed to enter judgment in favor of the defendants on the plaintiff's § 1983 federal civil rights claims set forth in Counts I, II, and III of the complaint, and the plaintiff's state-law tort claims set forth in Counts IV and V will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

An appropriate order follows.

Dated: March 6, 2026                    *s/Joseph F. Saporito, Jr.*
                                        JOSEPH F. SAPORITO, JR.
                                        United States District Judge